# Exhibit 1

Sidney Powell (pro hac application forthcoming)
Sidney Powell PC
Texas Bar No. 16209700
(517) 763-7499
Sidney@federalappeals.com

Alexander Kolodin, AZ Bar No. 030826
Christopher Viskovic, AZ Bar No. 035860[1]
**KOLODIN LAW GROUP PLLC**
3443 N. Central Ave. Ste. 1009
Phoenix, AZ  85012
Telephone: (602) 730-2985
Facsimile: (602) 801-2539
E-Mail:
Alexander.Kolodin@KolodinLaw.com
CViskovic@KolodinLaw.com
SAtkinson@KolodinLaw.com (file copies)

*Attorneys for Plaintiffs*
*(Additional counsel listed on signature page)*

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TYLER BOWYER, MICHAEL JOHN BURKE, NANCY COTTLE, JAKE HOFFMAN, ANTHONY KERN, CHRISTOPHER M. KING, JAMES R. LAMON, SAM MOORHEAD, ROBERT MONTGOMERY, LORAINE PELLEGRINO, GREG SAFSTEN, SALVATORE LUKE SCARMARDO, KELLI WARD, and MICHAEL WARD<br><br>Plaintiffs,<br><br>v.<br><br>DOUG DUCEY, in his official capacity as Governor of the State of Arizona, and KATIE HOBBS, in her official capacity as the Arizona Secretary of State<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF**<br><br>(Election Matter)<br><br>(TRO Requested) |

---

[1] District of Arizona admission scheduled for 12/9/2020.

## NATURE OF THE ACTION

1.       This civil action brings to light a massive election fraud, of the Election and Electors Clauses, and the Equal Protection and Due Process Clauses of the Fourteenth Amendment, of the U.S. Constitution and multiple violations of the Arizona election laws. These violations occurred during the 2020 General Election throughout the State of Arizona, as set forth in the affidavits of eyewitnesses and the voter data cited, the statistical anomalies and mathematical impossibilities detailed in the affidavits of expert witnesses.

2.       The scheme and artifice to defraud was for the purpose of illegally and fraudulently manipulating the vote count to manufacture an election of Joe Biden as President of the United States, and also of various down ballot democrat candidates in the 2020 election cycle. The fraud was executed by many means, but the most fundamentally troubling, insidious, and egregious ploy was the systemic adaptation of old-fashioned "ballot-stuffing."  It has now been amplified and rendered virtually invisible by computer software created and run by domestic and foreign actors for that very purpose.  This Complaint details an especially egregious range of conduct in Maricopa County and other Arizona counties using employing Dominion Systems, though this conduct occurred throughout the State at the direction of Arizona state election officials.

3.       The multifaceted schemes and artifices implemented by Defendants and their collaborators to defraud resulted in the unlawful counting, or fabrication, of hundreds of thousands of illegal, ineligible, duplicate or purely fictitious ballots in the State of Arizona, that collectively add up to multiples of Biden's purported lead in the State of 10,457 votes.

4.       While this Complaint, and the eyewitness and expert testimony incorporated herein, identify with specificity sufficient ballots required to set aside the 2020 General Election results, the entire process is so riddled with fraud, illegality, and statistical impossibility that this Court, and Arizona's voters, courts, and legislators, cannot rely on, or certify, any numbers resulting from this election.  Accordingly, this Court must set aside the results of the 2020 General Election and grant the declaratory and injunctive relief

requested herein.

## Dominion Voting Systems Fraud and Manipulation

5.      The fraud begins with the election software and hardware from Dominion Voting Systems Corporation ("Dominion") used in Maricopa County.  The Dominion systems derive from the software designed by Smartmatic Corporation, which became Sequoia in the United States.

6.      Smartmatic and Dominion were founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election.  *See* Ex. 1, Redacted Declaration of Dominion Venezuela Whistleblower ("Dominion Whistleblower Report").  Notably, Chavez "won" every election thereafter.

7.      As set forth in the Dominion Whistleblower Report, the Smartmatic software was contrived through a criminal conspiracy to manipulate Venezuelan elections in favor of dictator Hugo Chavez:

> Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic.  The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government.  In mid-February of 2009, there was a national referendum to change the Constitution of Venezuela to end term limits for elected officials, including the President of Venezuela. The referendum passed. This permitted Hugo Chavez to be re-elected an unlimited number of times.  . . .

> Smartmatic's electoral technology was called "Sistema de Gestión Electoral" (the "Electoral Management System"). Smartmatic was a pioneer in this area of computing systems. Their system provided for transmission of voting data over the internet to a computerized central tabulating center. The voting machines themselves had a digital display, fingerprint recognition feature to identify the voter, and printed out the voter's ballot. The voter's thumbprint was linked to a computerized record

of that voter's identity. Smartmatic created and operated the entire system. *See Exh. 1.* ¶¶ 10 & 14.

8. A core requirement of the Smartmatic software design ultimately adopted by Dominion for Arizona's elections was the software's ability to hide its manipulation of votes from any audit. As the whistleblower explains:

> Chavez was most insistent that Smartmatic design the system in a way that the system could change the vote of each voter without being detected. He wanted the software itself to function in such a manner that if the voter were to place their thumb print or fingerprint on a scanner, then the thumbprint would be tied to a record of the voter's name and identity as having voted, but that voter would not tracked to the changed vote. He made it clear that the system would have to be setup to not leave any evidence of the changed vote for a specific voter and that there would be no evidence to show and nothing to contradict that the name or the fingerprint or thumb print was going with a changed vote. Smartmatic agreed to create such a system and produced the software and hardware that accomplished that result for President Chavez. *Id.* ¶15.

9. The design and features of the Dominion software do not permit a simple audit to reveal its misallocation, redistribution, or deletion of votes. First, the system's central accumulator does not include a protected real-time audit log that maintains the date and time stamps of all significant election events. Key components of the system utilize unprotected logs. Essentially this allows an unauthorized user the opportunity to arbitrarily add, modify, or remove log entries, causing the machine to log election events that do not reflect actual voting tabulations—or more specifically, do not reflect the actual votes of or the will of the people.[2]

10. This Complaint will show that Dominion violated physical security standards by connecting voting machines to the Internet, allowing Dominion, domestic third parties

---

[2] *See* Ex. 7, August 24, 2020 Declaration of Harri Hursti, ¶¶45-48 (expert testimony in Case 1:17-cv-02989 in the U.S. District Court for the Northern District of Georgia). The Texas Secretary of State refused to certify Dominion for similar reasons as those cited by Mr. Hursti. *See* Ex. 11A, 11B, State of Texas Secretary of State, Elections Division, Report of Review of Dominion Voting Systems Democracy Suite 5.5-A at 2 (Jan. 24, 2020).

4

or hostile foreign actors to access the system and manipulate election results, and moreover potentially to cover their tracks due to Dominion's unprotected log. Accordingly, a thorough forensic examination of Dominion's machines and source code is required to document these instances of voting fraud, as well as Dominion's systematic violations of the Voting Rights Act record retention requirements through manipulation, alteration, destruction and likely foreign exfiltration of voting records. See 52 U.S.C. § 20701.

11. These and other problems with Dominion's software have been widely reported in the press and been the subject of investigations. In using Dominion Voting Systems Democracy Suite, Arizona officials disregarded all the concerns that caused Dominion software to be rejected by the Texas Board of elections in 2020 because it was deemed vulnerable to undetected and non-auditable manipulation. Texas denied Certification because of concerns that it was not safe from fraud or unauthorized manipulation. (See Exhs 11A&11B ).

12. An industry expert, Dr. Andrew Appel, Princeton Professor of Computer Science and Election Security Expert has recently observed, with reference to Dominion Voting machines: "I figured out how to make a slightly different computer program that just before the polls were closed, it switches some votes around from one candidate to another. I wrote that computer program into a memory chip and now to hack a voting machine you just need 7 minutes alone with a screwdriver."[3]

13. Further, Dominion's documented, and intentional, security flaws facilitated foreign interference in the 2020 General Election. For example, in the accompanying redacted declaration of a former electronic intelligence analyst with 305th Military Intelligence with experience gathering SAM missile system electronic intelligence, the Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections, including the most recent US general election in 2020. (See Ex. 12, copy of redacted witness affidavit).

---

[3] Andrew W. Appel, *et al.*, "Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters" at (Dec. 27, 2019),( attached hereto as Ex. 10 ("Appel Study")).

14.     Because this Complaint concerns mainly federal questions, it was not styled as a Statement of Contest within the meaning of ARS §§ 16-671 - 16-678.

15.     Nonetheless, the factual basis of this Complaint would also support an election contest under Arizona law since A.R.S. § 16-672 allows for contests on the grounds of misconduct, offenses against the elective franchise, on account of illegal votes, and by reason of erroneous count of votes.

16.     Similarly, the relief sought is in accord with Arizona law. A.R.S. § 16-676 provides clear remedies in the event of a successful contest, providing that the results of an election may either be annulled and set aside, A.R.S. § 16-676(B), or, if it appears that the winner was other than the person certified, the erroneously declared winner's certificate of election can be revoked A.R.S. § 16-676(C).

17.     In the event that the election is annulled and set aside, there would certainly not be time to hold a new election, especially given the issues identified herein. However, it would be eminently proper for the question of the choice of electors to then revert to the legislature, for "[t]here is no doubt of the right of the legislature to resume the power [to appoint electors] at any time, for it can neither be taken away nor abdicated." *Bush v. Gore*, 531 U.S. 98, 104, 121 S. Ct. 525, 529-30, 148 L.Ed.2d 388, 398 (2000) (citing with approval *McPherson v. Blacker*, 146 U.S. 1, 35, 13 S. Ct. 3, 10, 36 L.Ed. 869, 877 (1892)).

18.     Furthermore, this Court need not be concerned with whether such weighty questions can be addressed on an expedited timeline, because Arizona law provides very aggressive deadlines for the resolution of elections challenges. Specifically, Arizona law provides for election challenges to be resolved on the merits within 10 days of filing. A.R.S. § 16-676(A).

**Expert Witness Testimony on Widespread Voting Fraud**

19.     This Complaint presents expert witness testimony demonstrating that several thousands of illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular:

A. Unreturned mail ballots unlawfully ordered by third parties (average for Dr. Briggs Error #1): 219,135

B. Returned ballots that were deemed unreturned by the state (average for Dr. Briggs Error #2): 86,845

C. Votes by persons that moved out of state or subsequently registered to vote in another state for the 2020 election: 5,790.

D. "Excess votes" to historically unprecedented, and likely fraudulent turnout levels of 80% or more in over half of Maricopa and Pima County precincts: 100,724.

E. And Plaintiffs can show Mr. Biden received a statistically significant Advantage, based on fraud, from the use of Dominion Machines in a nationwide Study, which conservatively estimates Biden's advantage at 62,282 Votes.

20.     Except for the estimate of illegal out-of-state votes, each of these experts has identified distinct sources of illegal votes in sufficient numbers (*i.e.*, greater than Biden's purported margin of 10,457 votes), not only to affect, but to change the result of the 2020 General Election in Arizona.  Taken together, the irregularities, anomalies and physical and statistical impossibilities, account for at least 412,494 illegal ballots that were counted in Arizona.  This provides the Court with sufficient grounds to set aside the results of the 2020 General Election and provide the other declaratory and injunctive relief requested herein.

21.     The specific factual allegations of fraud and statutory and constitutional violations are set forth in greater detail below.  Section I describes specific violations of Arizona law.  Section II provides expert witness testimony quantifying the number of illegal votes due to distinct categories of voting fraud and other unlawful conduct.  Section III provides fact and expert witness testimony, as well as summaries of other publicly available evidence (including judicial and administrative proceedings) regarding Dominion voting systems' voting fraud in Arizona during the 2020 General Election, the security flaws that allow election workers, or even hostile foreign actors, to manipulate Arizona election results, and the history of Dominion and its executives demonstrating that

Dominion had the specific intent to interfere, and change the results of, the 2020 General Election.

## JURISDICTION AND VENUE

22.     This Court has subject matter under 28 U.S.C. § 1331 which provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

23.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1343 because this action involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932).

24.     The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. §§ 2201 and 2202 and by Rule 57, Fed. R. Civ. P.

25.     This Court has jurisdiction over the related Arizona constitutional claims and state-law claims under 28 U.S.C. § 1367.

26.     Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in the District of Arizona. 28 U.S.C. § 1391(b) & (c).

27.     Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers have no authority to unilaterally exercise that power, much less flout existing legislation.

## THE PARTIES

28.     Each of the following Plaintiffs is a registered Arizona voter and a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Arizona: Tyler Bowyer, a resident of Maricopa County; Nancy Cottle, a resident of Maricopa County; Jake Hoffman, a resident of Maricopa County; Anthony Kern, a resident of Maricopa County; James R. Lamon, a resident of Maricopa County; Samuel Moorhead, a resident of Gila County; Robert Montgomery, a resident of Cochise County; Loraine Pellegrino, a

resident of Maricopa County; Greg Safsten, a resident of Maricopa County; Kelli Ward, a resident of Mohave County; and Michael Ward, a resident of Mohave County.

29.     Plaintiff Michael John Burke is a registered Arizona voter residing in Pinal County.  Mr. Burke is the Republican Party Chairman for Pinal County.

30.     Plaintiff Christopher M. King is a registered Arizona voter residing in Pima County.  Mr. Burke is the Republican Party Vice Chairman for Pima County.

31.     Plaintiff Salvatore Luke Scarmado is a registered Arizona voter residing in Mohave County.  Mr. Burke is the Republican Party Chairman for Mohave County.

32.     Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors."  *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of state officials implementing or modifying State election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).

33.     Plaintiffs bring this action to prohibit certification of the election results for the Office of President of the United States in the State of Arizona and to obtain the other declaratory and injunctive relief requested herein.  Defendants certified those results on November 30, 2020, indicating a plurality for Mr. Biden of 10,457 votes out of 3,420,565 cast.

34.     The Defendants are Arizona Governor Doug Ducey, and Arizona Secretary of State Katie Hobbs.

35.     Defendant Governor Doug Ducey is named as a defendant in his official capacity as Arizona's governor.

36.     Defendant Secretary of State Katie Hobbs is named as a defendant in her official capacity as Arizona Secretary of State, who serves as the chief election officer in the State of Arizona.

**STATEMENT OF FACTS**

37.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988, to remedy deprivations of rights, privileges, or immunities secured by the Constitution and laws of the United States and to contest the election results, and the corollary provisions under the Arizona Constitution.

38.     The United States Constitution sets forth the authority to regulate federal elections. With respect to congressional elections, the Constitution provides:

39.

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators.
> U.S. CONST. art. I, § 4 ("Elections Clause").

40.     With respect to the appointment of presidential electors, the Constitution provides:

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.
> U.S. CONST. art. II, § 1 ("Electors Clause").

41.     None of Defendants is a "Legislature" as required under the Elections Clause or Electors Clause to set the rules governing elections. The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley*, 285 U.S. 365. Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." Id. at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 135 S. Ct. 2652, 2668 (U.S. 2015).

42.     While the Elections Clause "was not adopted to diminish a State's authority to determine its own lawmaking processes," *Ariz. State Legislature,* 135 S. Ct. at 2677, it does hold states accountable to their chosen processes when it comes to regulating federal elections, *id.* at 2668. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush,* 531 U.S. at 113 (Rehnquist, C.J., concurring); *Smiley,* 285 U.S. at 365.

43.     Secretary Hobbs certified the Presidential Election results on November 30, 2020.  The Presidential election results in Arizona show a difference of 10,457 "tallied" votes in favor of former Vice-President Joe Biden over President Trump.

44.     The specific factual allegations of fraud and statutory and constitutional violations are set forth in greater detail below.  Section I describes specific violations of Arizona law.  Section II provides expert witness testimony quantifying the number of illegal votes due to distinct categories of voting fraud and other unlawful conduct.  Section III provides fact and expert witness testimony, as well as summaries of other publicly available evidence (including judicial and administrative proceedings) regarding Dominion voting systems' voting fraud in Arizona during the 2020 General Election, the security flaws that allow election workers, or even hostile foreign actors, to manipulate Arizona election results, and includes a summary of information relating to the motive and opportunity, and a pattern of behavior to prove that Dominion and its executives demonstrating that Dominion had the specific intent to interfere, and change the results of, the 2020 General Election.

45.     Based upon all the allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to enjoin the certification of the election results and invalidate the election results...

## I.   VIOLATIONS OF ARIZONA ELECTION LAW

### A. Arizona Election Law

46.     Pursuant to A.R.S. § 16-550(A), the county recorder or other officer in charge of elections shall compare the signatures on the early ballot affidavit with the signature of the elector on the elector's registration record. If the signature is inconsistent, the county recorder or other officer in charge of elections shall make reasonable efforts to contact the voter and allow the voter to correct or confirm the inconsistent signature.

47.     Pursuant to A.R.S. § 16-625, the officer in charge of elections shall ensure that electronic data from and electronic or digital images of ballots are protected from physical and electronic access, including unauthorized copying or transfer, and that all

security measures are at least as protective as those prescribed for paper ballots.

**B.**  Fact Witness Testimony of Arizona Law Violations

**1.  Poll Watchers Failed to Adequately Verify Signatures on Ballots.**

48.      Affiant Burns stated that, while she was not permitted to be within viewing range of computer screens or monitors, she did have an opportunity to view "High Confidence" signatures following a brief power outage. *Id.*  Upon seeing these, she was "disturbed … that the signatures were not even close to the signatures that they were 'comparing' the ballot signature to," and because she was told by the one poll worker with whom she was allowed to speak that "these signatures were counted." *(See Exh. 21)*

**2.  Biased and Partisan Maricopa County Poll Referees.**

49.      Affiant Low expressed concern that "the two Maricopa County *referees*, who [were] called upon to settle any unresolved disputes between the adjudicators, were registered 'Independent Party' members."  (See Exh. 20, Low aff. ¶7) (emphasis in original).  When asked about that, they told Mr. Low that "this *set up* was laid out per Arizona Statute." *Id.* (emphasis in original).

Due to the high likelihood of the Dominion machine rejecting ballots, a "set up" like the one discussed above, impacts the outcome of the results of theelection. The machines make determinations on what ballots to invalidate or validate based on an algorithm that operates offshore before tallying the votes locally..

To begin, the judges that adjudicate ballots must be evenly distributed amongst the major parties per A.R.S. § 16-531(A). There should be zero tolerance of fraud like this in any election system.

**3.  Irregularities Involving Dominion Voting Machines & Employees.**

50.      Affiant Low and fellow poll watcher Greg Wodynski repeatedly asked the Dominion employee (named "Bruce") at their polling location as to whether the Dominion machines were connected to the internet and how data was backed up.  The Dominion employee repeatedly denied that the machines were connected to the Internet, *id.* ¶11, but "admitted that he took a complete copy of the voter files, being stored in the Dominion

1   system out of the building with him every night as a form of a 'back up' copy." *Id.* ¶22.

2      51.      Low's fellow poll watcher, Affiant Gregory Wodynski, provides more detail

3   on these regularities.  First, Dominion employees and supervisors informed Mr. Wodynski

4   "that about 12% of mail in ballots were being rejected and needed human intervention in

5   the adjudication process," which "amounted to tens of thousands of ballots that required

6   intervention" in the days he was an observer.  Ex. 22, Wodynski aff at ¶9.  Mr. Wodynski

7   confirms that "Bruce" stated that "he would perform a manual daily system backup to an

8   external hard drive," *id.* ¶10, and that "he made a daily second disk backup to a new spare

9   hard drive[] … [that] were being physically moved off site to another building outside the

10  MTEC building," but would not say where. *Id.* ¶11.  Bruce further stated "**there was NO**

11  **CHAIN OF CUSTODY on data backup hard drives leaving the MTEC facility on a**

12  **daily basis for an undisclosed location.**" *Id.* (emphasis in original).

13     52.      Mr. Wodynski also testified to a conversation with Dominion employee

14  Bruce of the "the specifics of a process where he was manually manipulating stored scanner

15  tabulation data files," which "he described as a processing issue at the numerous

16  adjudication computer workstations." *Id.* ¶12.  Bruce claimed that this was to split large

17  files into small files for adjudication.  *Id.* ¶13. Mr. Wydnoski was concerned because this

18  "**was a human intervention process and therefore creating a potential for intention or**

19  **non-intentional errors or lost ballot files.**" *Id.*

20     **4. Problems with Certification of Dominion Voting Machines.**

21     53.      Affiant Linda Brickman, the 1st Vice-Chair of the Maricopa County

22  Republican Committee, oversaw the Secretary of State certification of Dominion voting

23  machines on November 18, 2020.  Ex. 23, Brickman Aff at 1.  Mr. Brickman observed the

24  following problems:

25          •      Signature verification standards were constantly being lowered by
                  Supervisors in order to more quickly process that higher amount of early
26                and mail-in ballots (from approx. 15 points of similarities, to a minimum of
                  3, lowered to 1, and ultimately to none – "Just pass each signature
27                verification through")  …

28

- •     Challenged signatures on envelopes where the signature was a completely different person than the name of the listed voter, was let through and approved by supervisors.

- •     Challenged runs or batches of envelopes for signature verification observed by me to be the exact same handwriting on the affidavit envelopes on numerous envelopes.  When I asked if the County Attorney would be alerted for possible ballot fraud, I was told no, but supervisors would take care of it. …

- •     In the Duplication room, I observed with my Democratic partner the preparation of a new ballot since the original may have been soiled, damaged, or ripped, and wouldn't go through the tabulator.  I read her a Trump/Republican ballot and as soon as she entered it into the system the ballot defaulted on the screen to a Biden/Democratic ballot. We reported this to supervisors, and others in the room commented that they had witnessed the same manipulation.  We were never told what, if any, corrective action was taken.

- •     Election Office Observers – when it became apparent that more and more early and mail-in ballots would need to be processed, I mentioned that the current rule of the number of observers per party was not adequate (1 per party, unless all parties agreed to more).  And since the Governor refused to call the Legislature into session for any reason, and little incentive for the Democrats to agree to a higher adequate number, there was no way 1 observer per Party, forced to the back of a room, or behind a see-through wall, had a legitimate opportunity to see what elections workers were seeing in real time and doing, especially where up to 20 or more workers processing tasks, sometimes in 10 seconds or less!  And I personally observed most observers acting "clueless", and do not believe any of them even realized the challenges I made and referenced above.

- •     And lastly, one of the most egregious incidents in both the Duplication and Adjudication rooms which I worked, I observed the problem of Trump votes with voters checking the bubble for a vote for Trump, but ALSO, writing in the name "Donald Trump" and checking the bubble next to his hand written name again, as a duplicated vote, counting as an "OVERVOTE," which means – no vote was counted at all, despite the policy having been changed to allow these overvotes.  Supervisors contradicted their own policies where the intent was clear.  Ray Valenzuela, Director of Elections, told me openly at the morning of the Dominion Certification (November 18, 2020), that this was incorrect, the Supervisors were terribly mistaken and as an Adjudicator, I was instructed incorrectly, and these many votes SHOULD HAVE BEEN COUNTED AND NOT TURNED AWAY AS AN OVERVOTE.

1

*Id.* at 5-6.

## II.  EXPERT WITNESS TESTIMONY:
## EVIDENCE OF WIDESPREAD VOTER FRAUD

**1.     In Arizona 86,845 Mail-In Ballots Were Lost, and 219,135 More Were Fraudulently Recorded for Voters who Never Requested Mail-In Ballots.**

54.     The attached report of William M. Briggs, Ph.D. ("Dr. Briggs Report") summarizes the multi-state phone survey that includes a survey of Arizona voters collected by Matt Braynard, which was conducted from November 15-17, 2020.  *See* Ex., Dr. Briggs Report at 1, and Att. 1 ("Briggs Survey").  The Briggs Survey identified two specific errors involving unreturned mail-in ballots that are indicative of voter fraud, namely: "**Error #1:** those who were recorded as receiving absentee ballots *without* requesting them;" and "**Error #2:** those who returned absentee ballots but whose votes went missing (*i.e.*, marked as unreturned)."  *Id.*  Dr. Briggs then conducted a parameter-free predictive model to estimate, within 95% confidence or prediction intervals, the number of ballots affected by these errors are from a total population of 518,560 unreturned mail-in ballots for the State of Arizona.

55.     With respect to **Error #1**, Dr. Briggs' analysis estimated that **208,333 to 229,337 ballots** out of the total 518,560 unreturned ballots were recorded for voters who had **not** requested them.  *Id.*  All of these absentee ballots were sent to someone besides the registered voter named in the request, and thus could have been filled out by anyone and then submitted in the name of another voter.  *Id.*  (Ballots ordered by third parties that were voted, those would no longer be in the unreturned pool and therefore cannot be estimated from this data set.)

56.     With respect to **Error #2**, he found **78,714 to 94,975 ballots** out of 518,560 unreturned ballots recorded for voters who **did return their ballots, but were recorded as being unreturned.** *Id.*  These absentee ballots were either lost or destroyed (consistent with allegations of Trump ballot destruction) and/or were replaced with blank ballots filled

out by election workers, Dominion or other third parties.

57.      Taking the average of the two types of errors together, **303,305 ballots, or 58% of the total, are disenfranchisement and unlawful.***Id.* These errors are not only conclusive evidence of widespread fraud by the State of Arizona, but they are fully consistent with the evidence about Dominion presented in Section III below insofar as **these unreturned absentee ballots represent a pool of blank ballots that could be filled in by third parties to shift the election to Joe Biden,** and also present the obvious conclusion that there must be absentee ballots unlawfully ordered by third parties that were returned.

58.      Dr. Briggs' finding that 58% of "unreturned ballots" suffer from one of the two errors above is consistent with his findings in the four other States analyzed (Georgia 39%, Michigan 45%, Pennsylvania 37%, and Wisconsin 45%).  His analysis also provides further support that these widespread "irregularities" or anomalies were one part of a much larger multi-state fraudulent scheme to rig the 2020 General Election for Joe Biden.

> **2.      Evidence That At Least 5,790 Ineligible Voters Who Have Moved Out-of-State Illegally Voted in Arizona.**
>
> 3.      Evidence compiled by Matt Braynard using the National Change of Address ("NCOA") Database shows that 5,085 Arizona voters in the 2020 General Election moved out-of-state prior to voting, and therefore were ineligible.   Mr. Braynard also identified 744 Arizona voters who subsequently registered to vote in another state and were therefore ineligible to vote in the 2020 General Election.   The merged number is 5,790 ineligible voters whose votes must be removed from the total for the 2020 General ElectionEstimate of Illegal or Fictitious Votes Due to Dominion Voting Fraud and Manipulation.

59.      Expert witness Russell James Ramsland, Jr. identifies two types of statistical anomalies that he concludes are the result of voting fraud. (*See* Ex. 17).  First, as in other States Mr. Ramsland has analyzed (Georgia, Michigan and Wisconsin), Mr. Ramsland

finds historically unprecedented levels of turnout in specific counties or precincts. Using publicly available data, Mr. Ramsland determined that 66 percent of Pima County precincts (164 of 248) had turn out above 80%, and at least 36 had turnout above 90%, and that 54 percent of Maricopa County precincts (300 of 558) had turnout of 80% or more, and at least 30 over 90%. *Id.* ¶14. The report concludes that these extraordinary, and likely fraudulent, turnout levels "compels the conclusion to a reasonable degree of professional certainty that the vote count in Arizona, in particular for Maricopa and Pima counties for candidates for President contain at least 100,724 illegal votes that must be disregarded. *Id.*¶14.

60.     Mr. Ramsland also identifies an impossibility: "an improbable, and possibly impossible spike in processed votes," *id.* ¶16, like those also found in Georgia, Michigan and Wisconsin. Specifically, at 8:06:40 PM on November 3, 2020, there was a spike of 143,100 votes for Biden in Maricopa and Pima Counties. *Id.* Mr. Ramsland believes that the spike in Arizona, like those in the other three States he analyzed could have been manufactured by Dominion voting machines through a method described in greater detail in Section III below. *Id.*

61.     The summation of sections A through C above provide the following conclusions for the reports cited above, respectively.

- Returned ballots that were deemed unreturned by the state (average for Briggs Error #1): 219,135.

- Unreturned mail ballots unlawfully ordered by third parties (average for Briggs Error #1): 86,845.

- Votes by persons that moved out of state or subsequently registered to vote in another state for the 2020 election: 5,790.

- "Excess votes" to historically unprecedented, and likely fraudulent turnout levels of 80% or more in over half of Maricopa and Pima

1

County precincts: 100,724.

2

3
62.     In Conclusion, the Reports cited above show a total amount of illegal votes

4
identified that amount to 412,494 or over 40 times the margin by which candidate Biden

leads President Trump in the state of Arizona.

5
**III. FACTUAL ALLEGATIONS REGARDING DOMINION VOTING SYSTEMS**

6
5.     The State of Arizona used Dominion Voting Systems in Maricopa County.

7
Dominion's Results for 2020 General Election Demonstrate

8
Dominion Manipulated Election Results.

9
63.     *]*

10

11
64.     Mr. Ramsland analyzed the Edison data reported to, and posted by, the New

12
York Times, and concludes that this data "strongly suggests" the use of an "additive

13
algorithm" (referred to as "ranked choice voting algorithm" ("RCV") in Dominion's user

guide), combined with blank ballots loaded by the election workers or system operators, to

14
manipulate votes in Arizona.[6]

15

16
65.     Mr. Ramsland cites two specific examples from the Edison data

demonstrating Dominion's algorithmic vote manipulation.  The figure below, reproduced

17
from his testimony, graphs the Edison data on election night for Arizona, where the blue

18
bars "indicate the percentage of the batch that went for Biden," while the red trend lines

19
and arrows "indicate the impossible consistencies" in that vote percentage.  *Id.* ¶15.  In

20
other words, the blue bars and the horizontal trend lines show that "the percentage of the

21
votes submitted in each batch that went towards candidate [Biden] remain unchanged for

22
a series of time and for a number of *consecutive* batches …"  *Id.*  Mr. Ramsland concludes

23

24
[6]  *See* Ex. 17, ¶15 (quoting Democracy Suite EMS Results Tally and Reporting User

25
Guide, Chapter 11, Settings 11.2.2, which reads in part, "**RCV METHOD: This will
select the specific method of tabulating RCV votes to elect a winner.**")  Using the

26
RCV method allows the operator to enter "blank ballots … into the system and treated as

27
'write-ins.' Then the operator can enter an allocation of the write-ins among candidates
as he or she wishes. The result then awards the winner based on "points" that the

28
algorithm computes, not actual voter votes."  *Id.*

1  that the probability of such a consistent percentage in multiple consecutive batches

2  "approaches zero," and "makes clear an algorithm is allocating votes based on a

3  percentage." *Id.*



Impossible consistency in percentage of votes counted

66.     The second example analyzed by Mr. Ramsland is "the improbable, and



possibly impossible spike in processed votes" for Biden, namely, the insertion of 143,100 Biden votes in Maricopa and Pima Counties at 8:06:40 PM on November 3, 2020.  *See id.* ¶16.

This spike, cast  largely for Biden, could easily be produced in the Dominion EMS control system by pre-loading batches of blank ballots in files such as Write-Ins or other adjudication-type files then casting them almost all for Biden using the Override Procedure (to cast Write-In, Blank, or Error ballots) that is available to the operator of the system.  A few batches of blank ballots electronically pre-loaded into the adjudication files could easily produce a processed ballot stream this extreme so that actual paper ballots would not be needed until later to create "corroboration" for the electronic count. *Id.*

### 6.  Administrative and Judicial Decisions Regarding Dominion's Security Flaws.

67.     **Texas.**  Texas, through its by the Secretary of State, denied certification to nearly the same Dominion Democracy Suite on January 24, 2020, specifically because the "examiner reports raise concerns about whether Democracy Suite 5.5-A system … **is safe from fraudulent or unauthorized manipulation**."[7]

68.     **Wisconsin.** In 2018, Jill Stein was in litigation with Dominion Voting Systems ("DVS") after her 2016 recount request pursuant to WISCONSIN STAT.§5.905(4) wherein DVS obtained a Court Order requiring confidentiality on information including *voting counting source code*, which Dominion claims is proprietary – and must be kept secret from the public.  (*See* unpublished decision, Wisconsin Court of Appeals, No. 2019AP272 issued April 30, 2020).  Rather than engaging in an open and

---

[7]  See attached hereto, as Exh. 11, State of Texas Secretary of State, Elections Division, *Report of Review of Dominion Voting Systems Democracy Suite 5.5-A* at 2 (Jan. 24, 2020) (emphasis added).

transparent process to give credibility to Wisconsin's Dominion-Democracy Suite voting system, the processes were hidden during the receipt, review, opening, and tabulation of those votes in direct contravention of Wisconsin's Election Code and Federal law.

69. **Georgia.** Substantial evidence of this vulnerability was discussed in Judge Amy Totenberg's October 11, 2020 Order in the USDC N.D. Ga. case of *Curling, et al. v. Kemp, et. al*, Case No. 1:17-cv-02989 Doc. No. 964. *See*, p. 22-23 ("This array of experts and subject matter specialists provided a huge volume of significant evidence regarding the security risks and deficits in the system as implemented in both witness declarations and live testimony at the preliminary injunction hearing."); p. 25 ("In particular, Dr. Halderman's testing indicated the practical feasibility through a cyber attack of causing the swapping or deletion of specific votes cast and the compromise of the system through different cyber attack strategies, including through access to and alteration or manipulation of the QR barcode.") The full order should be read, for it is eye-opening and refutes many of Dominion's erroneous claims and talking points.

70. The Secretary of State appoints a committee of three people to test different voting systems. The committee is required to submit their recommendations to the Secretary of state who then makes the final decision on which voting system(s) to adopt. A.R.S. § 16-442(A) and (C)In explaining that "In summary, [the court] rejected the Secretary's argument that her certification of voting machines for use in Arizona is **a** political question that is inappropriate for judicial review." In doing so, the court explained the application of HAVA because Arizona requires that its voting systems are HAVA compliant which includes accreditation pursuant to HAVA. *Chavez v. Brewer*, 222 Ariz. 309, 317, 214 P.3d 397, 405, 2009). During the subsequent four years, the Arizona Legislature amended and enacted several statutes to effectuate HAVA. Among these changes, the legislature amended Arizona Revised Statutes (**A**.R.S.) section **16-442**(**A**) to require that the secretary of state determine the voting machines that are "certified for use" in elections. 2003 Ariz. Sess. Laws, ch. 260, § 9 (1st Reg. Sess.). The

legislature also amended the process for selecting electronic voting machines by requiring that the secretary of state certify only voting machines that "comply with [HAVA]" and requiring that all election machines or devices be "tested and approved by **a** laboratory that is accredited pursuant to [HAVA]." *Id.;* **A**.R.S. § **16-442**(B) (2006). The legislature also authorized the secretary of state to revoke the certification of any voting system that fails to meet the new standards. 2003 Ariz. Sess. Laws, ch. 260, § 9; 2005 Ariz. Sess. Laws, ch. 144, § 2; **A**.R.S. § **16-442**(**C**), (D).

*Chavez v. Brewer*, 222 Ariz. 309, 312, 214 P.3d 397, 400, (App. 2009).
Dominion Voting Systems is not currently certified pursuant to the EAC Voting Systems

71.     A District Judge found that Dominion's BMD ballots are not voter verifiable, and they cannot be audited in a software independent way. The credibility of a BMD ballot can be no greater than the credibility of Dominion's systems, which copious expert analysis has shown is deeply compromised.  Similar to the issues in Arizona and Wisconsin, Judge Totenberg of the District Court of Georgia Northern District held:

> Georgia's Election Code mandates the use of the BMD system as the uniform mode of voting for all in-person voters in federal and statewide elections. O.C.G.A. § 21-2-300(a)(2). The statutory provisions mandate voting on "electronic ballot markers" that: (1) use "electronic technology to independently and privately mark a paper ballot at the direction of an elector, interpret ballot selections, ... such interpretation **for elector verification**, and print **an elector verifiable paper ballot**;" and (2) "produce paper ballots which are marked with the elector's choices **in a format readable by the elector**" O.C.G.A. § 21-2-2(7.1); O.C.G.A. § 21-2-300(a)(2).  Plaintiffs and other voters who wish to vote in-person are required to vote on **a system that does none of those things**. Rather, the evidence shows that the Dominion BMD system does **not produce a voter-verifiable paper ballot or a paper ballot marked with the voter's choices in a format readable by the voter because the votes are tabulated solely from the unreadable QR code**.

> See Order, pp. 81-82. (Emphasis added).

72.     This case was later affirmed in a related case, in the Eleventh Circuit in 2018 related to Georgia's voting system in *Common Cause Georgia v. Kemp*, 347 F. Supp. 3d

1    1270 (11ᵗʰ Cir. 2018). The Court found that:

2

3       In summary, while further evidence will be necessary in the future, the
Court finds that the combination of the statistical evidence and witness

4       declarations in the record here (and the expert witness evidence in the
related *Curling* case which the Court takes notice of) persuasively

5       demonstrates the likelihood of Plaintiff succeeding on its claims. Plaintiff
has shown a substantial likelihood of proving that the Secretary's failure to

6       properly maintain a reliable and secure voter registration system has and
will continue to result in the infringement of the rights of the voters to cast

7       their vote and have their votes counted. *Id.at* 1294-1295.

8

9       73.      The expert witness in the above litigation in the United States District

10   Court of Georgia, Case 1:17-cv-02989-AT, Harri Hursti, specifically testified to

11   the acute security vulnerabilities, *see* Ex. 107, wherein he testified or found:

12      A. "The scanner and tabulation software settings being employed
to determine which votes to count on hand marked paper ballots

13         are likely causing clearly intentioned votes to be counted" "The
voting system is being operated in Fulton County in a manner

14         that escalates the security risk to an extreme level" "Votes are
not reviewing their BMD printed ballots, which causes BMD

15         generated results to be un-auditable due to the untrustworthy
audit trail." 50% or more of voter selections in some counties

16         were visible to poll workers. Dominion employees maintain

17         near exclusive control over the EMS servers. "In my
professional opinion, the role played by Dominion personnel in

18         Fulton County, and other counties with similar arrangements,
should be considered an elevated risk factor when evaluating the

19         security risks of Georgia's voting system." *Id.* ¶26.

20

21      B. A video game download was found on one Georgia Dominion
system laptop, suggesting that multiple Windows updates have

22         been made on that respective computer.

23

24      C. There is evidence of remote access and remote troubleshooting
which presents a grave security implication.

25      D. Certified identified vulnerabilities should be considered an
"extreme security risk."

26

27      E. There is evidence of transfer of control the systems out of the
physical perimeters and place control with a third party off site.

28

F. USB drives with vote tally information were observed to be removed from the presence of poll watchers during a recent election.

G. "The security risks outlined above – operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system." *Id.* ¶49.

### 7. Foreign Interference/Hacking and/or Manipulation of Dominion Results.

#### a. The Origins of Dominion Voting Systems

74.    Smartmatic and its inventors have backgrounds evidencing foreign connections with countries such as Serbia. Upon information and belief, the inventors listed below have such connections:

Applicant: SMARTMATIC, CORP.

Inventors**:** Lino Iglesias, Roger Pinate, Antonio Mugica, Paul Babic, Jeffrey Naveda, Dany Farina, Rodrigo Meneses, Salvador Ponticelli, Gisela Goncalves, Yrem Caruso[8]

75.    Another Affiant witness testifies that in Venezuela, she was in official position related to elections and witnessed manipulations of petitions to prevent a removal of President Chavez and because she protested, she was summarily dismissed.  She explains the vulnerabilities of the electronic voting system and Smartmatica to such manipulations.  (See Ex. 17, Cardozo Aff. ¶8).

#### b. US Government Advisory on Vulnerability to Foreign Hackers.

76.    In October of 2020 The FBI and CISA issued a JOINT CYBERSECURITY ADVISORY ON October 30, 2020 titled: **Iranian Advanced Persistent Threat Actor Identified Obtained Voter Registration Data**

---

[8] *See* Patents Assigned to Smartmatic Corp., *available at:* https://patents.justia.com/assignee/smartmatic-corp

1
2
3
4
5
6
7

> This joint cybersecurity advisory was coauthored by the Cybersecurity and Infrastructure Security Agency (CISA) and the Federal Bureau of Investigation (FBI). CISA and the FBI are aware of an Iranian advanced persistent threat (APT) actor targeting U.S. state websites to include election websites. CISA and the FBI assess this actor is responsible for the mass dissemination of voter intimidation emails to U.S. citizens and the dissemination of U.S. election-related disinformation in mid-October 2020.[1] (Reference FBI FLASH message ME-000138-TT, disseminated October 29, 2020). Further evaluation by CISA and the FBI has identified the targeting of U.S. state election websites was an intentional effort to influence and interfere with the 2020 U.S. presidential election.

8
9

(See CISA and FBI Joint Cyber Security Advisory of October 30, 2020, a copy attached hereto as Ex. 18.)

10
11
12

### c. Expert Witness Testimony on Dominion Vulnerability to Foreign Interference and Ties to Hostile Foreign Governments

13
14
15
16
17
18
19
20
21
22
23
24

77.     A PhD Declarant analyzed the cumulative vote percentages sorted by ward or precinct sizes.  This concept was previously used throughout the report on voter irregularities in Iulu Fries'dat and Anselmo Sampietro's "*An electoral system in crisis"* at http://www. electoralsystemincrisis.org/.    In Fries' dat's report there was an anomalous dependency on precinct size in many of the 2016 primary elections.  The larger precincts had introduced the use of voting machines.  However, one could also theorize the opportunity for cheaters to cheat in small precincts, where there may be less oversight. Normally, we would expect the cumulative vote percentage to converge to an asymptote, and bounce around the mean until convergence.  An example of this can be found from the 2000 Florida Democratic presidential primary between Gore and Bradley. (*See* Exh. __, at p. 8).  This is shown in Figure 8, and is taken from Fries' dat's report:

25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14



Figure 8: Baseline Cumulative Fractions Sorted by Precinct Size

15    (*See* Exh. __, at p. 9).

16

17    The Declarant then analyzed Maricopa county in Arizona, in addition to other swing

18    states. The data was obtained from the Maricopa county recorder website at

19    https://recorder.maricopa.gov/media/ArizonaExportByPrecinct_110320.txt

20    The Declarant sorted precincts by size and tallied the cumulative vote percentages. It

21    should rapidly approach an asymptote, but again in Figure 18 we see an anomaly. The

22    Biden percentage is higher in the smaller precincts, primarily at the expense of Trump,

23    again suggesting vote switching, since the 3rd party percentages immediately approach

24    the asymptote.

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





Figure 18:  Maricopa County Arizona Percentage vs Precinct Size

(*See* Exh. 19, at p. 14).

In Figure 19 the Declarant focuses on the third-party percentages, which we see are indeed independent of precinct size and converge quickly to the asymptote. This is about what we would expect if the third-party candidates were counted fairly. It is in sharp contrast to the precinct size dependency and slow convergence of the Trump and Biden percentages.



Figure 19: Third Party Percentages vs Size in Maricopa County

27

(*See* Exh. 19, at p. 15).

78.     An analysis of the Dominion software system by a former US Military Intelligence expert subsequently found that the Dominion Voting system and software are accessible - and was compromised by rogue actors, including foreign interference by Iran and China.  (*See* Ex. 12, Spider Declaration (redacted for security reasons).)

79.     The expert does an analysis and explains how by using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, Dominion allowed foreign adversaries to access data and intentionally provided access to Dominion's infrastructure in order to monitor and manipulate elections, including the most recent one in 2020.  *Id*. Several facts are set forth related to foreign members of Dominion Voting Systems and foreign servers as well as foreign interference.).

80.     Another Declarant first explains the foundations of her opinion and then addresses the concerns of foreign interference in our elections through hardware components from companies based in foreign countries with adverse interests. (*See* Ex. 13). She explains that Dominion Voting Systems works with SCYTL, and that votes on route, before reporting, go to SCYTL in foreign countries.  On the way, they get mixed and an algorithm is applied, which is done through a secretive process.

> The core software used by ALL SCYTL related Election Machine/Software manufacturers ensures "anonymity" Algorithms within the area of this "shuffling" to maintain anonymity allows for setting values to achieve a desired goal under the guise of "encryption" in the trap-door… *Id*.

81.     The Affiant goes on to explain the foreign relationships in the hardware used by Dominion Voting Systems and its subsidiary Sequoia and explains specifically the port that Dominion uses, which is called Edge Gateway and that is a part of Akamai Technologies based in Germany and China.

82.     This Declarant further explains the foundations of her opinion and then

addresses the concerns of foreign interference in our elections through hardware components from companies based in foreign countries with adverse interests.

> The concern is the HARDWARE and the NON – ACCREDITED VSTLs as by their own admittance use COTS. The purpose of VSTL's being accredited and their importance is ensuring that there is no foreign interference / bad actors accessing the tally data via backdoors in equipment software. The core software used by ALL SCYTL related Election Machine/Software manufacturers ensures "anonymity". **Algorithms within the area of this "shuffling" to maintain anonymity allows for setting values to achieve a desired goal under the guise of "encryption" in the trap-door…**

(See Id. at ¶32).

83.     Scytle, contracts with the AP – which receives the results tallied by SCYTL on  behalf of Dominion.  (See Exh. 13 at par. 33). This becomes highly relevant since SCYTLE is complete offshore.  (See Exh. 13 at par.44) And where the ballots go through a process described in three categories for a ballot cast, Step 1 involves Configuring the Data; Step 2 involves Cleansing which means determining which ballots are valid and which are not; and Step 3 involves "Shuffling" where the ballots get mixed and the algorithm is applied to distribute the votes. It is when the algorithm is applied, that happens secretly and the parameters of that algorithm are only known to SCYTL and Dominion. (See Exh. 13, pars. 44-50)  – and  where it gets encrypted as "ciphertexts."

> Certification Program, nor is its' provider.  China is not currently the only nation involved with COTS system provided to election machines or the networking, so is Germany via a LAOS founded Chinese linked cloud service company that works with SCYTL named Akamai Technologies – that have their offices in China and are linked to the server for Dominion Software.  (See Exh. 13 at par. 36))

Mathematical evidence of the seeding "injection"  of votes can be seen from the data feed on November 3, 2020 for Maricopa and Pima counties, where a spike can be seen which means a large number of votes were injected into the totals. (See Exh. 13 at par. 69).

84.     The Affiant explains the use of an algorithm and how it presents throughout the statement, but specifically concludes that,

> **The "Digital Fix" observed with an increased spike in VOTES for Joe Biden can be determined as evidence of a pivot**. Normally it would be assumed that the algorithm had a Complete Pivot. Wilkinson's demonstrated the guarantee as:

$$\frac{\|U\|_\infty}{\|A\|_\infty} \leq n^{\frac{1}{2}\log(n)}$$

> Such a conjecture allows the growth factor the ability to be upper bound by values closer to n. Therefore, complete pivoting can't be observed because there would be too many floating points. Nor can partial as the partial pivoting would overwhelm after the "injection" of votes. Therefore, external factors were used which is evident from the "DIGITAL FIX." (*See Id*. at pars. 67-69)

> "The algorithm looks to have been set to give Joe Biden a 52% win even with an initial 50K+ vote block allocation was provided initially as tallying began (as in case of Arizona too). In the am of November 4, 2020 the algorithm stopped working, therefore another "block allocation" to remedy the failure of the algorithm. This was done manually as ALL the SYSTEMS shut down NATIONWIDE to avoid detection."

> (*See Id*. at par. 73)

85.     And Russ Ramsland can support that further by documenting the data feed that came from Dominion Voting Systems to Scytl based on certain available data, that it was reported with decimal points, which is contrary to one vote as one ballot:  **"The fact that we observed raw vote data coming directly that includes decimal places establishes selection by an algorithm, and not individual voter's choice. Otherwise, votes would be solely represented as whole numbers (votes cannot possibly be added up and have decimal places reported)."**

1

**8.  Additional Independent Findings of Dominion Flaws.**

2

86.       Further supportive of this pattern of incidents, reflecting an absence of

3

mistake, Plaintiffs have since learned that the "glitches" in the Dominion system, that have

4

the uniform effect of hurting Trump and helping Biden, have been widely reported in the

5

press and confirmed by the analysis of independent experts.

6

7

**1.Central Operator Can Remove, Discard or Manipulate Votes.**

8

87.       Mr. Watkins further explains **that the central operator can remove or**

9

**discard batches of votes.**  "After all of the ballots loaded into the scanner's feed tray have

10

been through the scanner, the "ImageCast Central" operator will remove the ballots from

11

the tray then have the option to either "Accept Batch" or "Discard Batch" on the scanning

12

13

menu …. "  (Ex. 14, Watkins aff. ¶11).  ¶8.

14

88.       Mr. Watkins further testifies that the user manual makes clear that the system

15

allows for threshold settings to be set to find all ballots get marked as "problem ballots"

16

for discretionary determinations on where the vote goes stating:

17

18

9.  During the ballot scanning process, the "ImageCast Central" software
will detect how much of a percent coverage of the oval was filled in by the
voter. The Dominion customer determines the thresholds of which the oval
needs to be covered by a mark in order to qualify as a valid vote. If a ballot
has a marginal mark which did not meet the specific thresholds set by the
customer, then the ballot is considered a "problem ballot" and may be set
aside into a folder named "NotCastImages".

19

20

21

22

23

10.  Through creatively tweaking the oval coverage threshold settings, and
advanced settings on the ImageCase Central scanners, it may be possible to
set thresholds in such a way that a non-trivial amount of ballots are marked
"problem ballots" and sent to the "NotCastImages" folder.

24

25

26

11.  The administrator of the ImageCast Central work station may view all
images of scanned ballots which were deemed "problem ballots" by simply
navigating via the standard "Windows File Explorer" to the folder named

27

28

31

"NotCastImages" which holds ballot scans of "problem ballots". It may be possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro operating system. Id. ¶¶ 9-11.

89.     The Voting Rights Act, 52 U.S.C. §10101(e), provides, in relevant part:

… When used in the subsection, the word "vote" includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election;

    a. The VRA, 52 U.S.C. § 10307, also provides, in relevant part, that,

    b. No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote.

    c. Federal law also requires the states to maintain uniform voting standards. Section 301 of the Help America Vote Act of 2002 [HAVA], (Pub. L. 107–252, 116 Stat. 1704, codified at 42 U.S.C. § 15481.

    d. Each voting system used in an election for Federal office shall meet the following requirements:   (6) Each State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State. 42 U.S.C. §15481(a)(6)

    e. State laws define a "vote" as a "ballot" that clearly indicates the intent of the voter to choose a candidate.  "Ballot" means a ballot label, sheet of paper or

envelope on which votes are recorded. The term also includes a sheet or card, filmstrip or other device listing or containing information relative to offices, candidates and referenda which is placed, projected or composed on the board or screen inside a voting machine.  Wis. Stat. § 5.02Every ballot, except a voting machine ballot, shall bear substantially the following information on the face: "Notice to electors: This ballot may be invalid unless initialed by 2 election inspectors. If cast as an absentee ballot, the ballot must bear the initials of the municipal clerk or deputy clerk.   Wis. Stat. Ann. § 5.54 (emphasis in originalFederal law also requires the states to maintain uniform voting standards. Section 301 of the Help America Vote Act of 2002 [HAVA], (Pub. L. 107–252, 116 Stat. 1704, codified at 42 U.S.C. § 15481. Among other things, it provides that, "Each voting system used in an election for Federal office shall meet the following requirements: …   (6) Each State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State." 42 U.S.C. §15481(a)(6)

## 2.Dominion – By Design – Violates Federal Election & Voting Record Retention Requirements.

90.      The Dominion System put in place by its own design violates the intent of Federal law on the requirement to preserve and retain records – which clearly requires preservation of all records requisite to voting in such an election.

§ 20701. Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation

Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the

Commonwealth of Puerto Rico are voted for, **all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election,** except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

See 52 USC § 20701.

### 3. Dominion Vulnerabilities to Hacking.

91.     Plaintiffs have since learned that the "glitches" in the Dominion system -- that have the uniform effect of hurting Trump and helping Biden -- have been widely reported in the press and confirmed by the analysis of independent experts, a partial summary of which is included below.

(1) Users on the ground have full admin privileges to machines and software. The Dominion system is designed to facilitate vulnerability and allow a select few to determine which votes will be counted in any election.  Workers were responsible for moving ballot data from polling place to the collector's office and inputting it into the correct folder. Any anomaly, such as pen drips or bleeds, is not counted and is handed over to a poll worker to analyze and decide if it should count. This creates massive opportunity for improper vote adjudication.   (Ex. 14 Watkins aff. ¶¶8 & 11).

(2) Affiant witness (name redacted for security reasons), in his sworn testimony explains he was selected for the national security guard detail of the President of Venezuela, and that he witnessed the creation of Smartmatic for the purpose of election vote manipulation:

I was witness to the creation and operation of a sophisticated electronic

voting system that permitted the leaders of the Venezuelan government to manipulate the tabulation of votes for national and local elections and select the winner of those elections in order to gain and maintain their power.  Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic which included … The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government.  (*Id.* ¶¶6, 9, 10).

92.      Specific vulnerabilities of the systems in question that have been well documented or reported include:

A. Barcodes can override the voters' vote: As one University of California, Berkeley study shows, "In all three of these machines [including Dominion Voting Systems] the ballot marking printer is in the same paper path as the mechanism to deposit marked ballots into an attached ballot box.  This opens up a very serious security vulnerability:  the voting machine can make the paper ballot (to add votes or spoil already-case votes) after the last time the voter sees the paper, and then deposit that marked ballot into the ballot box without the possibility of detection." (See Ex. 10, Appel Study).

B. Voting machines were able to be connected to the internet by way of laptops that were obviously internet accessible. If one laptop was connected to the internet, the entire precinct was compromised.

C. October 6, 2006 – **Congresswoman Carolyn Maloney calls on Secretary of Treasury Henry Paulson to conduct an investigation into Smartmatic based on its foreign ownership and ties to Venezuela.** (See Ex. 15).  Congresswoman Maloney wrote that "It is undisputed that Smartmatic is foreign owned and it has acquired Sequoia … Smartmatic now acknowledged that Antonio Mugica, a Venezuelan businessman has a controlling interest in Smartmatica, but the company has not revealed who all other Smartmatic owners are.  *Id.*

D. Dominion "got into trouble" with several subsidiaries it used over alleged cases of fraud. One subsidiary is Smartmatic, a company "that

has played a significant role in the U.S. market over the last decade."[9] Dominion entered into a 2009 contract with Smartmatic and provided Smartmatic with the PCOS machines (optical scanners) that were used in the 2010 Philippine election, the biggest automated election run by a private company. The automation of that first election in the Philippines was hailed by the international community and by the critics of the automation. The results transmission reached 90% of votes four hours after polls closed and Filipinos knew for the first time who would be their new president on Election Day. In keeping with local Election law requirements, Smartmatic and Dominion were required to provide the source code of the voting machines prior to elections so that it could be independently verified. *Id.*

E.   Litigation over Smartmatic "glitches" alleges they impacted the 2010 and 2013 mid-term elections in the Philippines, raising questions of cheating and fraud. An independent review of the source codes used in the machines found multiple problems, which concluded, "The software inventory provided by Smartmatic is inadequate, … which brings into question the software credibility."[10]

F.   Dominion acquired Sequoia Voting Systems as well as Premier Election Solutions (formerly part of Diebold, which sold Premier to ES&S in 2009, until antitrust issues forced ES&S to sell Premier, which then was acquired by Dominion). This map illustrates 2016 voting machine data—meaning, these data do not reflect geographic aggregation at the time of acquisition, but rather the machines that retain the Sequoia or Premier/Diebold brand that now fall under Dominion's market share. Penn Wharton Study at 16.

G.   In late December of 2019, three Democrat Senators, Warren, Klobuchar, Wyden and House Member Mark Pocan wrote about their 'particularized concerns that secretive & "trouble -plagued companies"' "have long skimped on security in favor of convenience," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, &

---

[9] *Voting Technology Companies in the U.S. – Their Histories and Present Contributions,* Access Wire, (Aug. 10, 2017*), available at:* https://www.accesswire.com/471912/Voting-Technology-Companies-in-the-US--Their-Histories.

[10] *Smartmatic-TIM Running Out of Time to Fix Glitche*s, ABS-CBN News (May 4, 2010), *available at*: https://news.abs-cbn.com/nation/05/04/10/smartmatic-tim-running-out-time-fix-glitches.

Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S." (See Ex. 16).

H. Senator Ron Wyden (D-Oregon) said the findings [insecurity of voting systems] are "yet another damning indictment of the profiteering election vendors, who care more about the bottom line than protecting our democracy." It's also an indictment, he said, "of the notion that important cybersecurity decisions should be left entirely to county election offices, many of whom do not employ a single cybersecurity specialist."[11]

93.     The House of Representatives passed H.R. 2722 in an attempt to address these very risks on June 27, 2019:

This bill addresses election security through grant programs and requirements for voting systems and paper ballots.
The bill establishes requirements for voting systems, including that systems (1) use individual, durable, voter-verified paper ballots; (2) make a voter's marked ballot available for inspection and verification by the voter before the vote is cast; (3) ensure that individuals with disabilities are given an equivalent opportunity to vote, including with privacy and independence, in a manner that produces a voter-verified paper ballot; (4) be manufactured in the United States; and (5) meet specified cybersecurity requirements, including the prohibition of the connection of a voting system to the internet.

See H.R. 2722.

**9. Because Dominion Senior Management Has Publicly Expressed Hostility to Trump and Opposition to His Election, Dominion Is Not Entitled to Any Presumption of Fairness, Objectivity or Impartiality, and Should Instead Be Treated as a Hostile Partisan Political Actor.**

94.     Dr. Eric Coomer is listed as the co-inventor for several patents on

---

[11]  Kim Zetter, *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials*, VICE (Aug. 8, 2019) ("VICE Election Article"), *available at:* https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems-have-been-left-exposed-online-despite-official-denials.

ballot adjudication and voting machine-related technology, all of which were assigned to Dominion.[12]  He joined Dominion in 2010, and most recently served as Voting Systems Officer of Strategy and Director of Security for Dominion.  Dr. Coomer first joined Sequoia Voting Systems in 2005 as Chief Software Architect and became Vice President of Engineering before Dominion Voting Systems acquired Sequoia.  Dr. Coomer's patented ballot adjudication technology is built into Dominion voting machines sold throughout the United States, including those used in Arizona.  (See attached hereto Exh 6, Jo Oltmann Aff.).

95.     In 2016, Dr. Coomer admitted to the State of Illinois that Dominion Voting machines can be manipulated remotely.[13]  He has also publicly posted videos explaining how Dominion voting machines can be remotely manipulated. See Id.[14]

_____

[12] *See* "Patents by Inventor Eric Coomer," *available at:* https://patents.justia.com/inventor/eric-coomer.  This page lists the following patents issued to Dr. Coomer and his co-inventors: (1) U.S. Patent No. 9,202,113, Ballot Adjudication in Voting Systems Utilizing Ballot Images (issued Dec. 1, 2015); (2) U.S. Patent No. 8,913,787, Ballot Adjudication in Voting Systems Utilizing Ballot Images (issued Dec. 16, 2014);  (3) U.S. Patent No. 8,910,865, Ballot Level Security Features for Optical Scan Voting Machine Capable of Ballot Image Processing, Secure Ballot Printing, and Ballot Layout Authentication and Verification (issued Dec. 16, 2014); (4) U.S. Patent No. 8,876,002, Systems for Configuring Voting Machines, Docking Device for Voting Machines, Warehouse Support and Asset Tracking of Voting Machines (issued Nov. 4, 2014); (5) U.S. Patent No. 8,864,026, Ballot Image Processing System and Method for Voting Machines (issued Oct. 21, 2014); (6) U.S. Patent No. 8,714,450, Systems and Methods for Transactional Ballot Processing, and Ballot Auditing (issued May 6, 2014), available at: https://patents.justia.com/inventor/eric-coomer.

[13] Jose Hermosa, *Electoral Fraud: Dominion's Vice President Warned in 2016 That Vote-Counting Systems Are Manipulable*, The BL (Nov. 13, 2020), *available at*: https://thebl.com/us-news/electoral-fraud-dominions-vice-president-warned-in-2016-that-vote-counting-systems-are-manipulable.html.

[14] See, *e.g.,* "Eric Coomer Explains How to Alter Votes in the Dominion Voting System" (Nov. 24, 2020) (excerpt of presentation delivered in Chicago in 2017), *available at:* https://www.youtube.com/watch?v=UtB3tLaXLJE.

96.     Dr. Coomer has emerged as Dominion's principal defender, both in litigation alleging that Dominion rigged elections in Georgia and in the media.  An examination of his previous public statements has revealed that Dr. Coomer is highly partisan and even more anti-Trump, precisely the opposite of what would expect from the management of a company charged with fairly and impartially counting votes (which is presumably why he tried to scrub his social media history).  (See Id.)

97.     Unfortunately for Dr. Coomer, however, a number of these posts have been captured for perpetuity.  Below are quotes from some of his greatest President Trump and Trump voter hating hits to show proof of motive and opportunity. (See Id).

> If you are planning to vote for that autocratic, narcissistic, fascist ass-hat blowhard and his Christian jihadist VP pic, UNFRIEND ME NOW! No, I'm not joking. … Only an absolute F[**]KING IDIOT could ever vote for that wind-bag fuck-tard FASCIST RACIST F[**]K! … I don't give a damn if you're friend, family, or random acquaintance, pull the lever, mark an oval, touch a screen for that carnival barker … UNFRIEND ME NOW!  I have no desire whatsoever to ever interact with you. You are beyond hope, beyond reason.  You are controlled by fear, reaction and bullsh[*]t.  Get your shit together.  F[**]K YOU! Seriously, this f[**]king ass-clown stands against everything that makes this country awesome!  You want in on that? You [Trump voters] deserve nothing but contempt.
> *Id.* (July 21, 2016 Facebook post).[15]

98.     In a rare moment of perhaps unintentional honesty, Dr. Coomer anticipates this Complaint and many others, by slandering those seeking to hold election riggers like Dominion to account and to prevent the United States' descent into Venezuelan levels of voting fraud and corruption out of which Dominion was born:

> Excerpts in stunning Trump-supporter logic, "I know there is a lot of voter fraud.  I don't know who is doing it, or how much is happening, but I

---

[15]  In this and other quotations from Dr. Coomer's social media, Plaintiffs have redacted certain profane terms.

1
2

know it is going on a lot." This beautiful statement was followed by, "It happens in third world countries, this the US, we can't let it happen here." *Id.* (October 29, 2016 Facebook post); (See also Exh. 6)

3
4
5
6
7
8
9
10
11

1.       Dr. Coomer, who invented the technology for Dominion's voting fraud and has publicly explained how it can be used to alter votes, seems to be extremely hostile to those who would attempt to stop it and uphold the integrity of elections that underpins the legitimacy of the United States government:

And in other news… There be some serious fuckery going on right here fueled by our Cheeto-in-Chief stoking lie after lie on the flames of [Kris] Kobach… [Linking Washington Post article discussing the Presidential Advisory Commission on Election Integrity, of which former Kansas Secretary of State Kris Kobach was a member, entitled, "The voting commission is a fraud itself. Shut it down."] *Id.* (September 14, 2017 Facebook post.] (Id.)

12
13
14
15
16
17
18
19
20
21

99.       Dr. Coomer also keeps good company, supporting and reposting ANTIFA statements slandering President Trump as a "fascist" and by extension his supporters, voters and the United States military (which he claims, without evidence, Trump will make into a "fascist tool"). *Id.* (June 2, 2020 Facebook post). Lest someone claims that these are "isolated statements" "taken out of context", Dr. Coomer has affirmed that he shares ANTIFA's taste in music and hatred of the United States of America, *id.* (May 31, 2020 Facebook post linking "F[**]k the USA" by the exploited), and the police. *Id.* (separate May 31, 2020 Facebook posts linking N.W.A. "F[**]k the Police" and a post promoting phrase "Dead Cops"). *Id.* at 4-5.

22
23
24
25
26
27
28

100.       Affiant and journalist Joseph Oltmann researched ANTIFA in Colorado. *Id.* at 1. "On or about the week of September 27, 2020," he attended an Antifa meeting which appeared to be between Antifa members in Colorado Springs and Denver Colorado," where Dr. Coomer was present. In response to a question as to what Antifa would do "if Trump wins this … election?", Dr. Coomer responded "Don't worry about the election. Trump is not going to win. I made f[**]king sure of that … Hahaha." *Id.* at 2.

101.     By putting an anti-Trump zealot like Dr. Coomer in charge of election "Security," and using his technology for what should be impartial "ballot adjudication," Dominion has given the fox the keys to the hen house *and has forfeited any presumption of objectivity, fairness, or even propriety*.   It appears that Dominion does not care about even an appearance of impropriety, as its most important officer has his fingerprints all over a highly partisan, vindictive,  and personal vendetta against the Republican nominee both in 2016 and 2020, President Donald Trump.  Dr. Coomer's highly partisan anti-Trump rages show clear motive on the part of Dominion to rig the election in favor of Biden, and may well explain why for each of the so-called "glitches" uncovered, it is always Biden receiving the most votes on the favorable end of such a "glitch." (Id.)

102.     In sum, as set forth above, for a host of independent reasons, the Arizona election results concluding that Joe Biden received more votes that President Donald Trump must be set aside.

## COUNT I

**Defendants Violated the Elections and Electors Clauses and 42 U.S.C. § 1983.**

103.     Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

104.     The Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President.  U.S. Const. art. II, §1, cl. 2 (emphasis added).  Likewise, the Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof." U.S. Const. art. I, § 4, cl. 1 (emphasis added).

105.     The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley v. Holm,* 285 U.S. 355, 365 (1932).   Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments."  *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015).

106.     Defendants are not part of the Arizona Legislature and cannot exercise legislative power.  Because the United States Constitution reserves for the Arizona Legislature the power to set the time, place, and manner of holding elections for the President and Congress, county boards of elections and state executive officers have no authority to unilaterally exercise that power, much less to hold them in ways that conflict with existing legislation.

i.      The VRA, 52 U.S.C. § 10307, also provides, in relevant part, that,

ii.     No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote.

iii.    Federal law also requires the states to maintain uniform voting standards. Section 301 of the Help America Vote Act of 2002 [HAVA], (Pub. L. 107–252, 116 Stat. 1704, codified at 42 U.S.C. § 15481.

iv.     Each voting system used in an election for Federal office shall meet the following requirements: (6) Each State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State. 42 U.S.C. §15481(a)(6).

107.     With respect to unreturned ballots recorded for voters who did return their ballot but were recorded as being unreturned, Plaintiffs have identified 78,714 to 94,975 ballots out of 518,560 absentee / mail ballots.  Id.  These absentee ballots were either lost or destroyed (consistent with allegations of Trump ballot destruction) and/or were replaced with blank ballots filled out by election workers, Dominion or other third parties.

108.     Taking the average of the two types of errors together, 303,305 ballots, or

58% of the total, are defective. These errors are not only conclusive evidence of widespread fraud by the State of Arizona, but they are fully consistent with the evidence about Dominion presented in Section III below insofar as these unreturned absentee ballots represent a pool of blank ballots that could be filled in by third parties to shift the election to Joe Biden, and also present the obvious conclusion that there must be absentee ballots unlawfully ordered by third parties that were returned.

109.     There are also thousands of absentee ballots that Plaintiffs can show were sent to someone besides the registered voter named in the request, and thus could have been filled out by anyone and then submitted in the name of another voter specifically in violation of election law, one vote is one ballot.

110.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted. Defendants have acted and, unless enjoined, will act under color of state law to violate the Elections Clause.

111.     Accordingly, the results for President in the November 3, 2020 election must be set aside, the State of Arizona should be enjoined from transmitting the certified the results thereof, and this Court should grant the other declaratory and injunctive relief requested herein.

## COUNT II

### Defendants Violated The Equal Protection Clause of the
### Fourteenth Amendment U.S. Const. Amend. XIV & 42 U.S.C.
### § 1983

112.     Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

113.     The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. *See also Bush v. Gore*, 531 U.S. 98, 104 (2000) (having once granted the

right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over the value of another's). *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."). The Court has held that to ensure equal protection, a problem inheres in the absence of specific standards to ensure its equal application. *Bush*, 531 U.S. at 106 ("The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude, necessary.").

114. The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights. The requirement of equal protection is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

115. The disparate treatment of Arizona voters, in subjecting one class of voters to greater burdens or scrutiny than another, violates Equal Protection guarantees because "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. *Rice v. McAlister*, 268 Ore. 125, 128, 519 P.2d 1263, 1265 (1975); *Heitman v. Brown Grp., Inc.,* 638 S.W.2d 316, 319, 1982 Mo. App. LEXIS 3159, at *4 (Mo. Ct. App. 1982); *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 41, 56 P.3d 524, 536-37 (Utah 2002).

116. In statewide and federal elections conducted in the State of Arizona, including without limitation the November 3, 2020 General Election, all candidates, political parties, and voters, including without limitation Plaintiffs, have an interest in having the election laws enforced fairly and uniformly.

117. Defendants failed to comply with the requirements of Arizona law and the Equal Protection Clause and thereby diluted the lawful ballots of the Plaintiffs and of other Arizona voters and electors in violation of the United States Constitution guarantee

of Equal Protection. In Section II, Plaintiff experts provide testimony quantifying the number of illegal votes resulting from Defendants' statutory and constitutional violations. Finally, Section III details the additional voting fraud and manipulation enabled by the use Dominion voting machines, which had the intent and effect of favoring Biden and Democratic voters and discriminating against Trump and Republican voters.

118.    Defendants have acted and will continue to act under color of state law to violate Plaintiffs' right to be present and have actual observation and access to the electoral process as secured by the Equal Protection Clause of the United States Constitution and Arizona law.  Defendants thus failed to conduct the general election in a uniform manner as required by the Equal Protection Clause of the Fourteenth Amendment, the corollary provisions of Arizona election law.

119.    Plaintiffs seek declaratory and injunctive relief forbidding Defendants from certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

120.    In addition, Plaintiffs ask this Court to order that no ballot processed by a counting board in Arizona can be included in the final vote tally unless a challenger was allowed to meaningfully observe the process and handling and counting of the ballot, or that were unlawfully switched from Trump to Biden.

121.    Clearly the dilution of lawful votes violates the Equal Protection clause; and the counting of unlawful votes violates the rights of lawful Citizens.

122.    There are also thousands of absentee ballots that Plaintiffs can show were sent to someone besides the registered voter named in the request, and thus could have been filled out by anyone and then submitted in the name of another voter specifically in violation of election law, one vote is one ballot.  That is the dilution of lawful votes, while 78,714 to 94,975 ballots out of 518,560 unreturned ballots recorded for voters who did return their ballot but were recorded as being unreturned, and their vote was taken from

1    them.

2        123.      Plaintiffs have no adequate remedy at law and will suffer serious and

3    irreparable harm unless the declaratory and injunctive relief requested herein is

4    granted.  Indeed, the setting aside of an election in which the people have chosen

5    their representative is a drastic remedy that should not be undertaken lightly, but

6    instead should be reserved for cases in which a person challenging an election has

7    clearly established a violation of election procedures and has demonstrated that the

8    violation has placed the result of the election in doubt. Arizona law allows

9    elections to be contested through litigation, both as a check on the integrity of the

10   election process and as a means of ensuring the fundamental right of citizens to

11   vote and to have their votes counted accurately.

12                                **COUNT III**

13          **Fourteenth Amendment, Amend. XIV & 42 U.S.C. § 1983**

14              **Denial of Due Process On The Right to Vote**

15       124.      Plaintiffs refer to and incorporate by reference each of the prior

16   paragraphs of this Complaint as though the same were repeated at length herein.

17       125.      The right of qualified citizens to vote in a state election involving

18   federal candidates is recognized as a fundamental right under the Fourteenth

19   Amendment of the United States Constitution.  *Harper,* 383 U.S. at 665.    *See*

20   *also Reynolds*, 377 U.S. at 554 (The Fourteenth Amendment protects the "the right

21   of all qualified citizens to vote, in state as well as in federal elections.").  Indeed,

22   ever since the *Slaughter-House Cases*, 83 U.S. 36 (1873), the United States

23   Supreme Court has held that the Privileges or Immunities Clause of the Fourteenth

24   Amendment protects certain rights of federal citizenship from state interference,

25   including the right of citizens to directly elect members of Congress.  *See Twining*

26   *v. New Jersey*, 211 U.S. 78, 97 (1908) (*citing Ex parte Yarbrough*, 110 U.S. 651,

27   663-64 (1884)).  *See also Oregon v. Mitchell*, 400 U.S. 112, 148-49 (1970)

28   (Douglas, J., concurring) (collecting cases).

126.      The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562.  Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," *Burson v. Freeman*, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

127.      "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941).  "[T]he right to have the vote counted" means counted "at full value without dilution or discount."  *Reynolds*, 377 U.S. at 555, n.29 (*quoting South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

128.      "Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

129.      The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast.  The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. *See, e.g., Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of

eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

130.     The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (*quoting Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

131.     Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. See *Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

132.     Arizona law makes clear with regard to the electronic voting systems, that "[a]fter the close of the polls and after compliance with section 16-602 the members of the election board shall prepare a report in duplicate of the number of voters who have voted, as indicated on the poll list, and place this report in the ballot box or metal container, in which the voted ballots have been placed, which thereupon shall be sealed with a numbered seal and delivered promptly by two members of the election board of different political parties to the central counting place or other receiving station designated by the board of supervisors or officer in charge of elections, which shall not be more than fifty miles from the polling place from which the ballots are delivered. The person in charge of receiving ballots shall give a numbered receipt acknowledging receipt of such ballots to the person in charge who delivers such ballots. B. The chairman of the county committee of each political party represented on the ballot may designate a member of his party to accompany the ballots from each polling place to the central counting place.  A.R.S. § 16-608.

133.     As Plaintiffs have shown the ballots processed by Dominion Voting Systems reports to SCYTL, which is offshore, and uses an algorithm, that is secretive, and applies

a cleansing of invalid versus valid ballots, before the votes get tallied for distribution.

134.     Plaintiffs seek declaratory and injunctive relief enjoining Defendants from certifying the results of the General Election. This Court should enjoin Defendants from certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

**COUNT IV**

**Wide-Spread Ballot Fraud**

135.     Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

136.     The scheme of civil fraud can be shown with the pattern of conduct that includes motive and opportunity, as exhibited by the high level official at Dominion Voting Systems, Eric Coomer, and his visceral and public rage against the current U.S. President.

137.     Opportunity appears with the secretive nature of the voting source code, and the feed of votes that make clear that an algorithm is applied, that reports in decimal points despite the law requiring one vote for one ballot.

138.     The Supreme Court of Arizona set forth the standard of fraud for elections when it that held in the State of Arizona, fraud in an election is based on ballots procured in violation to the law: "We therefore hold that HN5 a showing of **fraud** is not a necessary condition to invalidate absentee **balloting**. It is sufficient that an express non-technical statute was violated, and **ballots** cast in violation of the statute affected the election. *Miller v. Picacho Elementary Sch. Dist. No*. 33, 179 Ariz. 178, 180, 877 P.2d 277, 279, (S. Ct.1994).

> "Contrary to *Findley,* election statutes are mandatory, not "advisory," or else they would not be law at all. If a statute expressly provides that non-compliance invalidates the vote, then the vote is invalid. If the statute does not have such a provision, non-compliance may or may not invalidate the vote depending on its effect. In the context of this case, "affect the result, or at least render it uncertain," *id.* at 269, 276 P. at 844, means **ballots** procured in violation of a non-technical statute in sufficient numbers to alter the outcome of the election.

Id.

1
2
3

139.    This Complaint presents expert witness testimony demonstrating that several hundred thousand illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular:

4
5
6

    A.   Unreturned mail ballots unlawfully ordered by third parties: 219,135

    B.   Returned ballots that were deemed unreturned by the state:  86,845

7

    C.   Votes by persons that moved out of state or subsequently registered to vote in another state for the 2020 election: 5,790.

8
9
10

    D.   "Excess votes" to historically unprecedented, and likely fraudulent turnout levels of 80% or more in over half of Maricopa and Pima County precincts: 100,724.

11
12

    E.   And Plaintiffs can show Mr. Biden received a statistically significant Advantage from the use of Dominion Machines in a nationwide Study, which conservatively estimates Biden's advantage at 62,282 Votes.

13
14
15
16
17
18
19
20
21

140.    The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. See, e.g., *Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

22
23
24
25
26

141.    Plaintiffs have no adequate remedy at law.  Plaintiffs contest the results of Arizona's 2020 General Election because it is fundamentally corrupted by fraud. Defendants should be enjoined from certifying an election where there were intentional violations of multiple provisions of Arizona law to elect Biden and other Democratic candidates and defeat President Trump and other Republican candidates.

27
28

**PRAYER FOR RELIEF**

142.     Accordingly, Plaintiffs seek an emergency order instructing Defendants to de-certify the results of the General Election for the Office of President.

143.     In the alternative, Plaintiffs seek an emergency order prohibiting Defendants from including in any certified results from the General Election the tabulation of absentee and mailing ballots which do not comply with Arizona law.

144.     Further, Plaintiffs ask this Court to order production of all registration data, ballot applications, ballots, envelopes, etc. required to be maintained by law.  When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Arizona and did so on a large scale and widespread basis.  The size of the voting failures, whether accidental or intentional, are multiples larger than the margin in the state.  For these reasons, Arizona cannot reasonably rely on the results of the mail vote. Relief sought is the elimination of the mail ballots from counting in the 2020 election. Alternatively, the electors for the State of Arizona should be disqualified from counting toward the 2020 election.  Alternatively, the electors of the State of Arizona should be directed to vote for President Donald Trump.

145.     For these reasons, Plaintiffs ask this Court to enter a judgment in their favor and provide the following emergency relief:

1.   An order directing Governor Ducey and Secretary Hobbs to de-certify the election results;

2.   An order enjoining Governor Ducey from transmitting the currently certified election results the Electoral College;

3.   An immediate emergency order to seize and impound all servers, software, voting machines, tabulators, printers, portable media, logs,

ballot applications, ballot return envelopes, ballot images, paper ballots, and all election materials related to the  November 3, 2020 Arizona election for forensic audit and inspection by the Plaintiffs;

4.   An order that no votes received or tabulated by machines that were not certified as required by federal and state law be counted;

5.   A declaratory judgment declaring that Arizona's failed system of signature verification violates the Electors and Elections Clause by working a de facto abolition of the signature verification requirement;

6.   A declaratory judgment declaring that currently certified election results violate the Due Process Clause, U.S. CONST. Amend. XIV;

7.   A declaratory judgment declaring that mail-in and absentee ballot fraud must be remedied with a Full Manual Recount or statistically valid sampling that properly verifies the signatures on absentee ballot envelopes and that invalidates the certified results if the recount or sampling analysis shows a sufficient number of ineligible absentee ballots were counted;

8.   A declaratory judgment declaring absentee ballot fraud occurred in violation of Constitutional rights, Election laws and under state law;

9.   A permanent injunction prohibiting the Governor and Secretary of State from transmitting the currently certified results to the Electoral College based on the overwhelming evidence of election tampering;

10.  Immediate production of 48 hours of security camera recording of all rooms used in Maricopa County for November 3, 2020 and November 4, 2020.

1    11. Plaintiffs further request the Court grant such other relief as is just and

2         proper, including but not limited to, the costs of this action and their

3         reasonable attorney fees and expenses pursuant to 42 U.S.C. 1988.

4

5

6

7        Respectfully submitted, this 1st day of December 2020.

8  /s Sidney Powell*                        /s Alexander Kolodin

9  Sidney Powell PC                    Kolodin Law Group PLLC
    Texas Bar No. 16209700                  AZ Bar No. 030826

10
    2911 Turtle Creek Blvd, Suite 300         3443 N. Central Ave Ste 1009
11  Dallas, Texas 75219                     Phoenix, AZ 85012

12  *Application for admission pro hac vice
    forthcoming

13
    Of Counsel:
14  Emily P. Newman (Virginia Bar No. 84265)
    Julia Z. Haller (D.C. Bar No. 466921)
15  Brandon Johnson (D.C. Bar No. 491730)

16  2911 Turtle Creek Blvd. Suite 300
    Dallas, Texas 75219
17
    *Application for admission pro hac vice Forthcoming
18
    L. Lin Wood (Georgia Bar No. 774588)
19  L. LIN WOOD, P.C.
    P.O. Box 52584
20  Atlanta, GA 30305-0584
    Telephone: (404) 891-1402
21
    Howard Kleinhendler (New York Bar No. 2657120)
22  Howard Kleinhendler Esquire
    369 Lexington Ave. 12th Floor
23  New York, New York 10017
    (917) 793-1188
24  howard@kleinhendler.com

25

26

27

28